[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This case arises out of the plaintiff state of Connecticut's efforts to obtain reimbursement for its costs incurred in the incarceration of the defendant Mark Strickland. The fundamental fact pattern is that the defendant was sentenced pursuant to a plea agreement on September 9, 1994. The state's ability to pursue prisoners for costs of incarceration became effective on October 1, 1997. In July, 2000, Strickland received a substantial sum as proceeds from a personal injury action. After the state initiated an action to recover the assets, Strickland interposed a number of special defenses, based on constitutional and other grounds. The state has moved to strike the defenses; this memorandum decides the motion to strike.
 FACTS
On February 22, 2001, the plaintiff, the state of Connecticut, acting through its commissioners of corrections and social services, filed a two count complaint against the defendant, Mark A. Strickland. It sought to recover the costs of his incarceration and reimbursement for payments made by the department of social services (DSS) to a minor child of the defendant. The following "facts" appear from the pleadings or may reasonably be inferred therefrom. The defendant has been an inmate at various correctional institutions operated by the department of correction (DOC) since July 27, 1992. On October 1, 1997, General Statutes § 18-85a and §§ 18-85a-1 through 18-85a-4
(Cost of Incarceration), inclusive, of the Regulations of Connecticut State Agencies became effective, thereby at least at first glance making the defendant liable for the ongoing cost of his incarceration. In count one of the complaint, the commissioner of correction seeks reimbursement of the per capita costs of the defendant's incarceration from October 1, 1997, through his next earliest parole/release date, May, 2001.
The defendant is also alleged to be the father of Kaitlyn Philips. Between September 1, 1990, and September 30, 1992, Kaitlyn Philips was CT Page 14792 allegedly a beneficiary of public assistance from DSS pursuant to the program of Aid to Families with Dependant Children. During the stated period, DSS made payments for the benefit of Kaitlyn Philips in the sum of $12,660.00. In count two of the complaint, DSS seeks to recoup the cost of those services from the defendant. Although the special defenses currently in issue purport to be directed to both of the counts in the complaint, it is clear from a reading of the briefs and an understanding of the context that they are addressed only to the first count of the state's complaint.
In July, 2000, the sum of $140,000.00 was deposited in the New Haven Savings Bank (NHSB) to an account in the name of the defendant.[1] On November 8, 2000, the plaintiff filed an application for a prejudgment remedy and moved for a temporary restraining order to enjoin any and all disbursements from the NHSB account. On January 29, 2001, after a full hearing, the court, O'Neill, J., found that there was probable cause to believe that the defendant is indebted to the DOC for the costs of his incarceration in the sum of $110,684 and to the DSS for reimbursement of public assistance benefits in the sum of $12,660[2] for a total debt to the plaintiff in the sum of $123,340. The court entered an order of garnishment in the sum of $130,000 on January 31, 2001.
On January 2, 2002, the defendant filed an answer and sixteen amended special defenses claiming various defenses to the application of the statute and regulations against him. On February 7, 2002, the plaintiff filed a motion to strike all sixteen of the defendant's special defenses and a memorandum of law in support of its motion. The defendant subsequently filed, on May 29, 2002, a brief in opposition to the plaintiffs motion to strike and on June 3, 2002, a supplemental brief in opposition. The plaintiff filed a reply memorandum on June 21, 2002.[3]
Argument took place on June 25, 2002, and the parties graciously agreed to extend the time in which to file a decision.
 DISCUSSION
"A party wanting to contest the legal sufficiency of a special defense may do so by filing a motion to strike. The purpose of a special defense is to plead facts that are consistent with the allegations of the complaint but demonstrate, nonetheless, that the plaintiff has no cause of action. . . . In ruling on a motion to strike, the court must accept as true the facts alleged in the special defenses and construe them in the manner most favorable to sustaining their legal sufficiency." (Citations omitted; internal quotation marks omitted.) Barasso v. Rear Still Hill Road, LLC, 64 Conn. App. 9, 13, 779 A.2d 198 (2001). In ruling on a motion to strike, the court must "construe the facts alleged in the CT Page 14793 complaint in a light most favorable to the pleader. If facts provable under the allegations would support a defense or a cause of action, the motion to strike must be denied." RK Constructors, Inc. v. Fusco Corp.,231 Conn. 381, 384, 650 A.2d 153 (1994). "In deciding upon a motion to strike or a demurrer, a trial court must take the facts to be those alleged in the complaint . . . and cannot be aided by the assumption of any facts not therein alleged. . . . Where the legal grounds for such a motion are dependent upon underlying facts not alleged in the . . . pleadings, the [movant] must await the evidence which may be adduced at trial, and the motion should be denied." (Citations omitted; internal quotation marks omitted.) Liljedahl Bros., Inc. v. Grigsby, 215 Conn. 345,348, 576 A.2d 149 (1990).
"The purpose of a special defense is to plead facts that are consistent with the allegations of the complaint but demonstrate, nonetheless, that the plaintiff has no cause of action." (Internal quotation marks omitted.) Danbury v. Dana Investment Corp., 249 Conn. 1, 17, 730 A.2d 1128
(1999). "At the outset, it must be recognized that a constitutional challenge is properly raised by special defense." Babon v. Wood, Superior Court, judicial district of Danbury, Docket No. 311674 (February 2, 1994, Moraghan, J.).
 A First Special Defense
The defendant alleges that § 18-85a, entitled Assessment for Costs of Incarceration, constitutes a bill of attainder in violation of the constitution of the United States, article one, § 10. The plaintiff argues in its motion to strike that § 18-85a is not a legislative act that inflicts punishment without a judicial trial. It should be stressed at the outset that a party seeking to have a court declare a statute unconstitutional has a heavy burden:
"A party who challenges the constitutionality of a statute `bears the heavy burden of proving its unconstitutionality beyond a reasonable doubt and we indulge in every presumption in favor of the statute's constitutionality." State v. Merdinger, 37 Conn. App. 379, 382, 655 A.2d 1167 (1995). In addition to showing that [a statute] is unconstitutional beyond a reasonable doubt, [a party] must show that "its effect or impact on him adversely affects a constitutionally protected right which he has." Society for Savings v. Chestnut Estates, Inc., 176 Conn. 563, 569, 409 A.2d 1020
CT Page 14794 (1979). Finally, "[w]hile the courts may declare a statute to be unconstitutional, our power to do this should `be exercised with caution, and in no doubtful case."
 Federal Deposit Ins. Co. v. Voll, 38 Conn. App. 198, 203 (1995).
Section 18-85 of the General Statutes was enacted in 1995. It provides, in its entirety, "The Commissioner of Correction shall adopt regulations in accordance with the provisions of chapter 54 concerning the assessment of inmates of correctional institutions or facilities for the costs of their incarceration." The corresponding regulations were adopted in 1997. Section 18-85a-2 of the regulations provides that inmates shall be charged and be responsible for the assessed cost of incarceration, which in turn is defined in § 18-85a-1 (a) as the inmate per capita per diem cost to be determined by the same method as used by the comptroller in determining costs of residing in state humane institutions in accordance with § 17b-223 of the General Statutes. "Inmate" is a person in a correctional facility serving a sentence imposed by a Connecticut state court, according to § 18-85a-1 (b) of the Regulations. The inmate's responsibility to pay the "assessed cost of incarceration" is to be discharged in part by deducting 10% from deposits made to the inmate's account, and any balance shall be collected by the Department of Administrative Services in cooperation with the Department of Correction. Section 18-85a-4.
Strictly speaking, a bill of attainder is narrowly defined. Generally, a bill of attainder is "[a] legislative act, directed against a designated person, pronouncing him guilty of an alleged crime, (usually treason,) without trial or conviction according to the recognized rules of procedure, and passing sentence of death and attainder[4] upon him." Black's Law Dictionary (4th Ed.), 1968. "A bill of attainder is a legislative act which inflicts punishment without a judicial trial." (Internal quotation marks omitted.) United States v. Lovett, 328 U.S. 303,315, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946); see also Benjamin v. Bailey,234 Conn. 455, 480-81, 662 A.2d 1226 (1995).
The defendant's special defense alleges that the statute was passed after his incarceration began and is aimed at easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial by charging them a fee for the cost of incarceration. The plaintiff relies on the three part test formulated in Nixon v. Administrator of General Services, 433 U.S. 425, 97 S.Ct. 2770,53 L.Ed.2d 867 (1977), which may be used to determine whether or not a CT Page 14795 legislative enactment exacts punishment in violation of the clause. This three part test questions: (1) whether the enactment inflicts a consequence that is traditionally thought to be punishment prohibited by the Bill of Attainder clause; (2) whether the enactment furthers a nonpunitive legislative purpose; and (3) the legislature's motivation for enacting the statute. Id., 475-78.
An analysis of the legislative enactment concerning costs of incarceration shows that it lacks most of the characteristics of a bill of attainder. As to the first consideration, the legislation does not single out the defendant for punishment; on the surface it applies to all inmates. It does not proscribe conduct, and it does not declare a punishment without the benefit of judicial proceedings. The regulations indicate that the state is to "collect" the assessed cost. The provision clearly contemplates, as illustrated by this action, that at some point in the collection process there will be the opportunity for judicial proceedings.
Second, the legislation on its face has the significant nonpunitive goals of reimbursement of taxpayer expenses and, to a degree, rehabilitation in the sense that inmates realize that they have some responsibility for their own care. See, e.g., Department of Corrections v. Adams, 278 Ill. App.3d 803, 809, 663 N.E.2d 1148 (1996); Burns v. Arkansas, 303 Ark. 64, 793 S.W.2d 779, 13 ALR5th 1117 (1990).
Finally, it is apparent from a review of the full legislative history of the enactment that the General Assembly's intention in passing the legislation was, primarily, the recoupment of expense and not punishment for the prior crime. Senator Kissel stated, at 1995 Senate Proceedings Vol. 38, p. 5101-02:
It's more than just fundamental fairness that we're talking about in trying to get people who are incarcerated in our corrections facilites to help pay some of the way for their own freight.
But it's also my understanding that the Department of Corrections . . . is trying to establish a system within the Department of Corrections where prisoners actually understand, to some extent, what it's like having to pay some of the bills. . . . And that they will have to try to understand the concept of paying their own way and that being incarcerated is not a total free ride.
Senator McDermott commented:
I think it's a fine piece of legislation to be able to say that the CT Page 14796 people should be able to help pay for part of the burden as to keeping them there. It also helps to make them more responsible citizens and learning that they have to pay for what — their keep and pay for the crimes that they commit. . . . Id., at 5104.
Written testimony from Attorney General Richard Blumenthal supported the proposed legislation on behalf of taxpayers who ought to be reimbursed when possible. He thought it unfair that prisoners received free services and veterans and social service recipients did not. He noted that seven states and the federal government had reimbursement provisions, and that such statutes had been upheld against constitutional challenges. Id., 3824.
In the House of Representatives, Representative Lawler stated that "[t]he intent of the bill is to allow the Commissioner of Corrections to seek reimbursement from inmates for the costs of their incarceration along the lines that are followed by other states which have been successful in this type of activity. From time to time there is a case where an inmate does have significant financial resources and the argument has been put forward as to why they shouldn't have to pay for at least a portion of the costs of their — of the services being provided to them by the State, including room and board and health and food, etcetera." 1995 House Proceedings Vol. 38, pp. 4813-14.
A thorough review of the legislative history shows that the only mention of "punishment" was advanced by the Connecticut Civil Liberties Union, which opposed the bill in its entirety. This opposition cannot, of course, be used to determine legislative intent.
It should be "noted that although the issue is new to this jurisdiction, it has been raised elsewhere and the claim that a scheme to recover costs of incarceration is a bill of attainder has never, to my knowledge, been upheld. See, e.g., Burns v. Arkansas, supra. The statutory scheme simply does not fit within the definition of a bill of attainder, and the motion to strike the first special defense is granted.
 B Second Special Defense
The defendant alleges in his special defense that an assessment resulting from the enactment of § 18-85a represents a penalty that is greater than what was indicated when he was originally sentenced. He also alleges that the new statute is a law that inflicts a greater punishment CT Page 14797 for a crime previously committed and is therefore a violation of the prohibition on ex post facto laws and a violation of the constitution of the United States, article one, § 10. The plaintiff argues that the law in question is not an ex post facto law because it: (1) does not punish as a crime an act previously committed which was innocent when done; (2) does not retroactively make the punishment for a crime more burdensome; and (3) does not deprive the defendant of defenses available according to law at the time the act was committed.
"An ex post facto law has been defined by [the United States Supreme] Court as one that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action, or that aggravates a crime, or makes it greater than it was, when committed." (Emphasis in original; internal quotation marks omitted.) State v. Diaz,237 Conn. 518, 531 n. 14, 679 A.2d 902 (1996). "[T]he ex post facto clause prohibits a state from enforcing a law that imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment [than] that [which was] then prescribed. . . ." (Internal quotation marks omitted.) State v. Kelly,256 Conn. 23, 88, 770 A.2d 908 (2001); see also Collins v. Youngblood, 497 U.S. 37, 42, 110 S.Ct. 2715, 111 L.Ed.2d 30
(1990) (ex post facto law is "law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime when committed" [emphasis in original]).
Critical to the definition of an ex post facto law is its penal nature. See Seling v. Young, 531 U.S. 250, 121 S.Ct. 727, 148 L.Ed.2d 734
(2001). Seven useful guidelines appear in Kennedy v. Mendoza-Martinez,372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963). They include considerations such as whether the enactment has traditionally been deemed criminal, whether the operation of the statute promotes traditional goals of punishment, whether the enactment involves an element of scienter, whether the triggering behavior is criminal, what the intent of the legislative body was in passing the enactment and whether more than the taxpayer's cost is sought to be recovered. On the basis of many of the same considerations involved in the analysis of the' bill of attainder issue, I find that § 18-85a is not penal in nature and is therefore not an ex post facto law.
Other jurisdictions have considered and rejected challenges to reimbursement statutes on the ground that they were ex post facto laws, generally on the ground that because they were focused on the noncriminal objective of reimbursing the public purse, they did not impose a greater punishment than was available at the time of sentencing (or the time of committing the crime). See State Department of Corrections v. Goad, CT Page 14798754 So.2d 95 (Fla.App. 2000); People v. Houston, 237 Mich. App. 707,604 N.W.2d 706 (1999); State ex rel. Nixon v. Taylor, 25 S.W.3d 566
(Mo.App. 2000); Burns v. Arkansas, supra. I have found no authority upholding a constitutional challenge to similar reimbursement schemes on the basis of ex post facto considerations. The motion to strike the second special defense is granted.
 C Third and Ninth Special Defense
The defendant asserts in his third and ninth special defenses that the taking of his assets constitutes a taking without just compensation in violation of the constitution of the United States, article five,[5]
and the constitution of Connecticut, article first, § 11. The plaintiff argues in response that the provisions of § 18-85a and §§ 18-85a (1) through 18-85a (4) of the Regulations of Connecticut State Agencies upon which the plaintiffs claim is based makes the defendant liable for costs reasonably related to a benefit provided to the defendant and that the defendant has received value.
"The fifth amendment to the United States constitution provides in relevant part: [N]or shall private property be taken for public use, without just compensation. The taking clause of the fifth amendment is made applicable to the states through the fourteenth amendment. . . . Article first, § 11, of the Connecticut constitution provides: The property of no person shall be taken for public use, without just compensation therefor." (Citations omitted; internal quotation marks omitted.) Cumberland Farms, Inc. v. Groton, 247 Conn. 196, 199 n. 3,719 A.2d 465 (1998). "[A]s to confiscatory regulations (as opposed to those regulating the use of property), a State may not sidestep the Takings Clause by disavowing traditional property interests long recognized under state law." Phillips v. Washington Legal Foundation,524 U.S. 156, 167, 118 S.Ct. 1925, 141 L.Ed.2d 174 (1998). "The concepts of fairness and justice that underlie the Takings Clause, of course, are less than fully determinate. Accordingly, we have eschewed any set formula for determining when justice and fairness require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons. . . . The outcome instead depends largely upon the particular circumstances [in that] case." (Citation omitted; internal quotation marks omitted.) Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency, 535 U.S. ___, ___, 122 S.Ct. ___ 152 L.Ed.2d 517, 549 (2002).
The defendant alleges that the 1994 plea agreement that resulted in his CT Page 14799 current incarceration imposed no obligation upon him to pay the fee described in § 18-85a. He further alleges that despite this, the plaintiff has filed suit seeking the fee owed pursuant to § 18-85a. The defendant then simply conclusorily alleges that such constitutes a taking without just compensation under the federal (count three) and state (count nine) constitutions.
The allegations of the third and ninth defenses, as plead, do not establish that an impermissible taking has occurred. Most notably, the defendant fails to allege that he has not received "just compensation" in return for the alleged taking. As the state points out, the defendant's allegation that he is incarcerated implies otherwise, namely, that he has received the benefits of food, clothing, shelter, medical care, and other services. There also is the opportunity to contest the taking; thus, "process" is available. See also the courts' rejections of prisoners' claims that they were deprived of property without due process of law in cases such as Hogan v. Arizona Board of Pardons and Paroles, 108 Ariz. 472,501 P.2d 944 (1972) and Cumbey v. State, 699 P.2d 1094 (Okla. 1985). Again, there apparently is no authority supporting such a claim. The plaintiffs motion to strike the defendant's third and ninth special defenses is granted.
 D Fourth and Fifth Special Defenses
The defendant alleges in his fourth special defense that the plaintiff, through DOC, has selectively enforced § 18-85a and that the plaintiff has denied the defendant equal protection of the law and equal application of the law among all the inmates of correction institution facilities across the state of Connecticut in violation of thefourteenth
amendment to the United States constitution. The defendant alleges in his fifth special defense that he has been denied his right to equal protection of the law and equal application of the law among all the inmates of correction institution facilities across the state of Connecticut in violation of the constitution of Connecticut, article first, § 1.[6] In both special defenses the defendant alleges that DOC "has not enforced § 18-85a against a vast majority of inmates, including but not limited to inmates Anthony Reynolds and Dave Lavoie but has enforced this against the [d]efendant." (Fourth Special Defense, ¶ 4; Fifth Special Defense, ¶ 6.)
The plaintiff argues that these special defenses must be stricken because the defendant does not allege that the allegedly unequal treatment of the defendant was the result of an impermissible CT Page 14800 classification. There is no allegation that the difference in enforcement is based on his race or religion or arises from retaliation for his exercise of a constitutionally protected right, or that the defendant was maliciously singled out for enforcement of the subject enactment with the intent to injure. Nor does he allege that the DOC knew, or had reason to know, that other inmates, including but not limited to, Anthony Reynolds and Dave Lavoie, had assets with. which to pay the costs of their incarceration as does the defendant herein.
"The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution is essentially a direction that all persons similarly situated should be treated alike. . . . A violation of equal protection by selective [treatment] arises if: (1) the person, compared with others similarly situated, was selectively treated; and (2) . . . such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." (Citations omitted; internal quotation marks omitted.) Cadlerock Properties Joint Venture, L.P. v. Commissioner of Environmental Protection, 253 Conn. 661,670-71, 757 A.2d 1, cert. denied, 531 U.S. 1148, 121 S.Ct. 1089,148 L.Ed.2d 963 (2000). See also Washington v. Davis, 426 U.S. 229,96 S.Ct. 2049, 48 L.Ed.2d 597 (1976); Schnabel v. Tyler, 230 Conn. 735, 762
(1994). It is, however, well established that the "[m]ere failure to prosecute other offenders is not a basis for a finding of denial of equal protection." LeClair v. Saunders, 627 F.2d 606 (2nd Cir. 1980). In this case the defendant claims that two individuals have not been assessed for the costs of their incarceration. No impermissible classification has been plead, however, so that no actionable invidious discrimination has been alleged.
The defendant also argues that the classification which allegedly occurs de facto between those with assets and those without assets violates equal protection standards. The defendant cites James v. Strange, 407 U.S. 128, 92 S.Ct. 2027, 32 L.Ed.2d 600 (1972), for the proposition that a system that discriminates on the basis of wealth regarding the recoupment of fees for public defender services violates standards of equal protection. It is clear from a reading of James, however, that the protections and exemptions extended to most debtors under Kansas' statutory scheme were far greater than the protections and exemptions extended to debtors who owed money to repay the state for public defender services. The court held that there was no rational basis for such discrimination.
In the case at hand, the discrimination which allegedly exists, and which for the purposes of this decision is assumed to exist, is based on CT Page 14801 ability to pay: the state presumably will not proceed against most incarcerated persons because there is likely to be little realistic chance of recovering any money. This is not irrational. When there is no invidious discrimination or suspect classification, notions of equal protection require only a rational basis. See, e.g., State v. Wright,246 Conn. 132, 139-40 (1998).
The defendant further argues that the classification is irrational because costs of incarceration are charged only to "inmates", who, pursuant to § 18-85a-1 (b) are those serving a sentence. Others, such as those acquitted, are not assessed charges. The defendant points to State v. Reed, 192 Conn. 520 (1984), for the proposition that a rational basis must exist in order to justify unequal treatment among those similarly situated.
In Reed, our Supreme Court found that the distinction between inmates found not guilty by reason of insanity, who were obligated to reimburse the state for the cost of care during their custody, and inmates who were convicted criminals, who were not so obligated, was not rationally based. Because their situations were substantially similar, and the state offered no reasonable basis for the difference in treatment, the classification was held to violate notions of equal protection. There is a simple distinction in the case at hand, however: those residents who are not sentenced prisoners do not have an obligation to reimburse the state, while those who are sentenced prisoners have such an obligation. Because of the presumption of innocence, and perhaps other considerations, the legislature quite rationally may have deemed it unfair for one to pay the costs of confinement where the confinement was, in some senses, a mistake.[7] And, hopefully, periods of confinement of those not sentenced are relatively brief. Recoupment of expenses for those periods of confinement, therefore, would not yield as significant financial benefits nor serve rehabilitative purposes.
Although the factual scenarios of course vary from jurisdiction to jurisdiction, I found no cases in which an equal protection claim was upheld in the context of prisoner reimbursement statutes. Claims of impermissible classifications were rejected in Burns v. State of Arkansas, supra; Auditor General v. Hall, 300 Mich. 215, 1 N.W.2d 516
(1942); and State Treasurer v. Wilson, 423 Mich. 138, 377 N.W.2d 703
(1985); see also Tillman v. Lebanon County Correctional Facility,221 F.3d 410 (3d Cir. 2000). The plaintiffs motion to strike the defendant's fourth and fifth special defenses is granted.[8]
 E
CT Page 14802 Sixth and Seventh Special Defenses
The sixth and seventh special defenses asserted by the defendant are similar in that they claim a setoff of the value of the services provided by the defendant while incarcerated against the costs of his incarceration. Additionally, in his seventh special defense the defendant makes a claim of quantum meruit and suggests the sum of $22,000 per year as a reasonable value based on a $10 per hour rate of compensation. The defendant claims he is entitled to have the reasonable value of the services he provides to the plaintiff deducted from his cost of incarceration. Such deduction would be calculated and estimated by a method imposed on all inmates in Connecticut.
In its motion to strike both of these special defenses, the plaintiff argues that the defendant, as an inmate, is not entitled to any compensation for his prison labor; rather, any compensation provided to inmates is by grace of the state. The plaintiff also takes issue with the defendant's claim for $10 an hour, calling such a rate ludicrous and without legal basis, because it is nearly double the federal minimal wage and nearly 65 percent more than the state minimum wage.
The statutory and regulatory scheme does not contemplate a reduction for any value of services; indeed, the universal rubric is that prison wages, if such term is not oxymoronic, are granted as a matter of grace. It was held that prisoners have no inherent right to payment of any wages for the work performed in prison and that they therefore have no right to determine any form or amount of such payment in Cumbey v. State,699 P.2d 1094 (Okla. 1985). Accord, Danneskjold v. Howrath, 82 F.3d 37
(2d Cir. 1996); Wendt v. Lynaugh, 841 F.2d 619 (5th Cir. 1988). The consensus appears to be that the labor and any remuneration therefor serve rehabilitative purposes only, in the effort to instill a sense of responsibility. Our Superior Court is in accord:
Moreover, the weight of authority seems to hold that such action does not exist in favor of prison inmates. Most courts have declined to extend wage/hour protection to prisoners who work in prison on the basis that inmates are not employees for purposes of the Fair Labor Standards Act. See Leader, Wages and Hours Law Practice Matthew Bender (1997) § 201(A) 1, Note 13. In dismissing an action similar to the present one brought against state officials a U.S. District Court in Minnesota held that inmates working in prison are not employees protected by minimum wage provisions stating that "any compensation CT Page 14803 for their labor is by grace of the state." McMaster v. Minnesota, et al., 819 F. Sup. 1429 (1993). See also 8 CJS Convicts, § 15.
Graham v. Chesapeake Cap Company, Inc., 1997 Ct. Sup. 7888, 20 CLR 117
(Wagner, J., 1997).
Because the statutory and regulatory scheme does not contemplate the reduction of the value of labor provided, and because it is well established that there is no right to any pay for prison labor in any event, the motion to strike the sixth and seventh defenses is granted. It should be noted that to the extent that labor performed actually reduces the cost of "room and board", if any, it may well be considered in the context of the tenth special defense.
 F Eighth Special Defense
The defendant claims that after the plea agreement which resulted in the defendant's present incarceration,[9] the Connecticut General Assembly enacted a statute which has imposed a penalty or further punishment upon the defendant over and above that which was agreed to between the parties at the time of the agreement for a guilty plea in violation of the constitution of Connecticut, article first,[10] §9.[11] The plaintiff argues that imposition of liability for costs of incarceration is neither a penalty nor punishment for crimes. The constitutional provisions relied on traditionally have been applied to claims of double jeopardy. See, e.g., State v. Mikolinski, 256 Conn. 543,555 (2001).
The Double Jeopardy clause prohibits, inter alia, multiple punishments for the same offense. There is no prohibition against civil and criminal sanctions for the same conduct; see, e.g., State v. Duke, 48 Conn. App. 71,75 (1998); similarly there is no violation of this clause if the second event is functionally civil rather than criminal. See Hudon v. United States, 522 U.S. 93, 118 S.Ct. 488, 139 L.Ed.2d 540 (1996); State v. Duke, supra.
As stated above, the requirement of reimbursing the state for the cost of imprisonment is not primarily criminal in nature, and thus cannot qualify as a second punishment for the purpose of the application of the Double Jeopardy Clause.[12] The motion to strike the eighth special defense is therefore granted. CT Page 14804
 G Tenth Special Defense
The defendant claims that the use of General Statutes § 17b-223 as an accounting method or procedure is inappropriate as applied to determine the cost of incarceration and does not in any way accurately determine the actual per capita per diem costs associated with the incarceration of an inmate as opposed to those staying in health care facilities. The defendant states in his special defense that the same accounting methods that are used to calculate the per capita costs of those residing at state humane institutions should not be the same as those applied to incarcerated individuals. This is mainly so, the defendant alleges, because inmates defray the costs of their incarceration by contributing to their own maintenance and in other ways contribute to their care.
The plaintiff moves to strike this special defense on the ground that this assertion fails to allege any legal basis for the conclusion alleged and upon which the court may act. Specifically, the plaintiff argues that the defendant fails to allege either how or why the use of the chosen accounting method is incorrect or unlawful.[13]
Taking the allegations in the light most favorable to the defendant, I find that the defense raises questions of fact and the motion to strike the tenth count is denied. Section 18-85a directs the commissioner to adopt regulations for the assessment of inmates for the costs of their incarceration. Implicit in this directive is the requirement that any assessment accurately reflect such costs, with the understanding, of course, that absolute precision may be impossible and only a rational basis is required. In the consideration of underlying facts, the trier may find it appropriate to consider the value of inmate services to the extent that they reduce the cost of incarceration. I make no suggestion at this point as to whether the regulation is rationally derived.
 H Eleventh Special Defense
The defendant claims that the plaintiff cannot retrospectively assess costs of incarceration, and that following the general legal principles of statutory construction, a law cannot be retroactively enforced after an event occurs, such event being his plea agreement. The plaintiff argues that imposition of liability for costs of incarceration is claimed only prospectively from the effective date of the applicable regulation CT Page 14805 of the DOC.
The eleventh special defense is not identical to the defenses alleging that the scheme violates the constitutional ban of ex post facto laws and that it violates notions of due process. Rather, it relies perhaps more mundanely on the claim that statutes are to be applied prospectively, unless the statute under consideration regulates procedure or the legislature's clear intent was to legislate retrospectively. See, in general, § 55-3 of the General Statutes.
The state's fundamental position is that the statute is not sought to be applied retrospectively because the money is sought to reimburse the state for the cost of incarceration occurring after the effective date of the regulations, and, because the statute is civil in nature, it does not seek to punish any conduct in the past. Strickland's claim is that at the time of his plea in 1994, costs were expressly waived, and any application to his cost of incarceration would thus would be inappropriately retroactive.
The parties do not appear to dispute the legal standards. The state, relying on cases such as Landgraf v. USI Film Production, 511 U.S. 244,114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), argues that a statute's application is not necessarily retroactive if it applies to conduct which happened prior to the passage of the legislation or if it upsets expectations. Partly because § 18-85, in effect at all relevant times, provides for deductions from prison wages to defray costs of incarceration, the state argues that any expectations that there never would be any demands for reimbursement of costs would not be reasonable. The state finally argues that costs of incarceration would at most be a collateral consequence of a plea of guilty, which consequence need not be raised on the record at the time of the plea agreement. See In re Jason C., 255 Conn. 565, 573 (2001). The defendant argues that the specific timing sequence in this case, beginning with the taking of the plea in 1994, shows that the "right" not to pay for cost of incarceration had vested, in a sense, prior to the enactment of § 18-85a. In making the argument, the defendant relies on authority such as Gormley v. State Employees Retirement Commission, 216 Conn. 523 (19), Darak v. Darak,210 Conn. 462 (1989) and Opinion of the Attorney General No. 99-005.
I believe that the defendant has alleged facts sufficient to survive a motion to strike. Although some of the state's reservations may be well taken, facts at the motion to strike stage of proceedings are to be construed most favorably to the pleader, and the motion to strike the eleventh special defense is denied. CT Page 14806
 I Twelfth Special Defense
The defendant claims that pursuant to § 18-85a-1, the plaintiff is not entitled to consider in the cost of incarceration expenses, such as depreciation, which are not directly attributable to the costs of incarceration of an inmate. The plaintiff moves to strike this special defense on the grounds that it fails to allege sufficient facts and fails to allege any legal basis for the conclusion alleged upon which the court may act.
First, in claiming that the defense fails to allege sufficient facts, the plaintiff argues that the defendant's claim that the DOC improperly allowed certain expenditures is flawed because it is the comptroller who makes the calculation at issue, citing § 18-85a-1 (a) in support. Section 18-85a-1 (a) simply provides that the per capita cost, per diem, at the component facilities within the DOG is "determined by employing the same accounting procedures as are used by the Office of the Comptroller." (Emphasis added.) Regs., Conn. State Agencies § 18-85a-1. It does not specifically provide that the comptroller makes the calculation. In addition, the claimed fact that the comptroller makes the calculation is a fact outside of the pleadings. See Liljedahl Bros., Inc. v. Grigsby, supra, 215 Conn. 348.
The next argument made by the plaintiff is that a per capita cost methodology which includes such costs as depreciation has been sanctioned as a proper method of assessing cost, citing in support a California Appeals Court opinion in which this type of accounting was found to be appropriate. The consideration of which costs are property permitted and/or included under the regulation and what accounting method is to be used depend on facts[14] and accordingly the motion to strike on this basis is denied.
Lastly, the plaintiff moves to strike this special defense on the ground that it fails to state a legal theory upon which the court can act. It argues that absent some showing by the defendant that the per capita cost methodology is unlawful, there is no legal basis for his claim. A difficulty with this position is that no authority has been cited in its support. Because the determination of the issue may depend upon factual determinations, the defense survives at this stage of the proceedings. The motion to strike the twelfth special defense is denied.
 J
CT Page 14807 Thirteenth Special Defense
The defendant claims that the plaintiff has denied him due process of law under the fourteenth amendment to the United States constitution and the due process clause of the constitution of Connecticut by failing to notify the general population and the prison population of the assessment of costs of incarceration and by denying them various administrative remedies and rights. The plaintiff argues that the due process clauses of the state and federal constitutions do not require the notices claimed in this special defense.
It is somewhat difficult to ascertain precisely what the defendant is suggesting in this special defense. As to the question of promulgation, the state argues that the regulation was duly presented in the Connecticut Law Journal and proper procedures were followed. As to the question of proper notice under the Due Process Clause, the state argues that no conduct is prohibited, so that the notion that the reasonable person ought to be able to determine in advance what standards to apply to his conduct is not germane. Cf. Packer v. Board of Education, 246 Conn. 89
(1998). The state asserts, in taking the position that the regulatory scheme is sufficiently clear to be understood, that the statutes and regulations can be pieced together in a cogent manner.[15]
The defendant has offered no specific authority regarding this defense. Nonetheless, because the state relies on facts outside the pleadings, specifically material in the Connecticut Law Journal, the motion to strike the defense is denied. On the record before me, however, I should note that I can see no apparent superficial constitutional violation.
 K Fourteenth Special Defense
The defendant alleges that the plaintiff failed to comply with the Administration Procedure Act in that it failed to state when and where interested parties could object to the proposed regulations. The plaintiff argues that the only notice required to be given by the DOC of its intent to promulgate regulations was published in the Connecticut Law Journal on July 2, 1996. In support of this argument, the plaintiff provides a copy of the Notice of Intent to Adopt Regulations from the Connecticut Law Journal July 2, 1996.[16]
Because the motion to strike relies on material outside the pleadings, the motion to strike the defense is denied. CT Page 14808
 L Fifteenth Special Defense
The defendant claims that § 18-85a violates the due process clause of the fourteenth amendment of the United States constitution in that the legislation is not rationally related to its legitimate goal. The plaintiff argues that a rational relationship to a legislative goal is not a due process concept and that both the legislation and the plaintiffs efforts to obtain payments of sums due to it from the defendant satisfy procedural and substantive due process requirements as a matter of law.
"[T]he legislature is not required to implement a public policy in a manner that is most narrowly tailored to achieve its end; its legislation will survive a substantive due process challenge so long as it is rationally related to a legitimate state purpose." Black v. Goodwin. Loomis Britton, Inc., 239 Conn. 144, 166, 681 A.2d 293 (1996). An examination of the legislative history, as recited above, clearly indicates that the goal is to have prisoners bear at least some of the expense of their incarceration and to instill some sense of responsibility. Substantive due process protects against government conduct that is, in some manner, shocking; see, e.g., ATC Partnership v. Town of Windham, 251 Conn. 597 (1999); and the fact that a particular enactment might not completely fulfill its purpose is hardly shocking. In James v. Strange, supra, the United States Supreme Court stated that the fact that the Kansas scheme for obtaining reimbursement of public defender costs actually recovered only a trivial fraction of actual costs was of little constitutional moment. Arguments of substantive due process violations in the context of prisoner reimbursement statutes were rejected in the cases of Ilkanic v. City of Fort Lauderdale, 705 So.2d 1371
(Fla. 1998); In re Metcalf, 92 Wash. App. 165, 963 P.2d 911 (1998); Tillman v. Lebanon County Correctional Facility, 221 F.3d 410 (3d Cir. 2000). I have been directed to no authority sustaining such a constitutional claim. I find, in sum, that there is some relationship between the statute and its stated goal, and I find no violation of substantive due process. The motion to strike the fifteenth special defense is granted.
 M Sixteenth Special Defense
The defendant asserts that the plaintiffs enforcement of § 18-85a
violates the original court order which stated costs were to be waived. CT Page 14809 The plaintiff argues that: (1) the defendant was sentenced in 1994, the statute was not enacted until 1995 and the regulation did not become effective until 1997; accordingly, it is legally impossible for either to have been considered in connection with the defendant's plea agreement and the court's subsequent sentencing order; (2) the debt for costs of incarceration is due to the DOC which was not a party to the defendant's plea agreement or sentencing order; and (3) imposition of liability for costs of incarceration is not punishment for this commission of crime.
This defense raises factual issues not appropriately resolved in the context of a motion to strike. The motion to strike the sixteenth special defense is denied.
 CONCLUSION
For the foregoing reasons, the plaintiffs motion to strike is granted as to the defendant's first, second, third, fourth, fifth, sixth, seventh, eighth, ninth and fifteenth special defenses, and is denied as to the defendant's tenth, eleventh, twelfth, thirteenth, fourteenth and sixteenth special defenses.
 ___________________, J. Beach